**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ASHANTI R. WOODS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:07CV1972 DJS (LMB) |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Ashanti R. Woods for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income benefits under Title XVI of the Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of the Complaint. (Document Number 17). Defendant has filed a Brief in Support of the Answer. (Doc. No. 20).

**Procedural History**

On September 7, 2004, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on June 15, 2003. (Tr. 54-56). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated February 5, 2007. (Tr. 40-44, 207-11, 12-

25).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on September 20, 2007.  (Tr. 8, 4-7). Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

**A.**    **ALJ Hearing**

Plaintiff's administrative hearing was held on September 13, 2006.  (Tr. 218).  Plaintiff was present and was represented by counsel.  (Id.).  The ALJ began the hearing by admitting the exhibits into evidence.  (Id.).

The ALJ then examined plaintiff, who testified that she had moved to a different address in St. Louis in August of 2005.  (Tr. 222).  Plaintiff stated that she was 32 years of age.  (Id.).

Plaintiff testified that she finished high school and attended trade school.  (Id.).  Plaintiff stated that she took business, computer technology, and marketing courses in trade school.  (Id.). Plaintiff testified that she obtained certificates in 2001.  (Id.).  Plaintiff stated that she never used the certificates in her employment because she obtained employment with Oklahoma State Department of Public Safety immediately after she graduated.  (Id.).  Plaintiff testified that she used computers at this position.  (Id.).  Plaintiff stated that she worked at this position for two years.  (Tr. 223).

Plaintiff testified that her last position was at a Laundromat.  (Id.).  Plaintiff stated that she worked at this position for approximately two months.  (Id.).

Plaintiff testified that prior to working at the Laundromat, she worked at a restaurant as a cashier and hostess for about two months.  (Id.).  Plaintiff stated that this was her only job since

2001. (Id.).

Plaintiff testified that she last worked in November 2004, at the Laundromat. (Id.). Plaintiff stated that she stopped working this part-time position because her employer told her that he no longer needed her. (Tr. 224). Plaintiff testified that at this position, she gave people change, wiped off the washers and dryers, and locked the doors in the evening. (Id.). Plaintiff stated that she worked from 5:00 p.m until close, which was 10:30 or 11:00 p.m. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that she lives in a house with her children, who are aged 16, 14, 13, 11, 9, and 7. (Id.). Plaintiff stated that she receives Medicaid benefits. (Tr. 225).

Plaintiff testified that she does not believe she could work full-time because she is unable to make it through a workday without napping. (Id.). Plaintiff stated that she also experiences difficulty focusing. (Id.). Plaintiff testified that the medication she takes makes her drowsy. (Id.). Plaintiff stated that she has been experiencing drowsiness and difficulty focusing since 2000, at which time she admitted herself to Griffin Memorial Hospital because she thought she was "going crazy." (Id.). Plaintiff testified that her problems have been getting worse since that time. (Id.).

Plaintiff stated that she gets anywhere between two and four hours of sleep in a typical night. (Tr. 226). Plaintiff testified that she wakes up frequently during the night, at which time she reads the Bible, walks around, checks the doors, and watches television. (Id.). Plaintiff stated that she takes a nap daily from 1:00 or 2:00 p.m until 4:00 p.m. (Id.). Plaintiff testified that she feels less agitated after waking from her nap. (Id.).

Plaintiff stated that she began receiving treatment for her problems after she was hospitalized at Griffin Memorial Hospital in 2000. (Tr. 227). Plaintiff testified that she took

medication for a period after she was discharged. (Id.). Plaintiff stated that she eventually stopped taking her medication. (Id.). Plaintiff testified that she sought treatment from doctors irregularly after her discharge. (Id.).

Plaintiff stated that she had a steady doctor at the time of the hearing. (Tr. 228). Plaintiff testified that she started seeing her current doctor in November of 2005. (Id.). Plaintiff stated that she sees a nurse practitioner, Ivy Alwell, on a regular basis. (Id.). Plaintiff testified that Ms. Alwell talks to her and regulates her medications. (Id.). Plaintiff stated that Ms. Alwell recently changed her medication from Depakote[1] to another medication. (Id.). Plaintiff testified that Ms. Alwell is treating her for bipolar disorder.[2] (Id.).

Plaintiff stated that due to the bipolar disorder, she experiences periods lasting about a week, during which she feels like she can do everything and is unable to sleep. (Tr. 229). Plaintiff testified that her children tell her that she is moody. (Id.). Plaintiff stated that she feels that she does not spend as much time with her children as she used to. (Id.). Plaintiff testified that instead of spending time with her children, she stays in her room. (Id.). Plaintiff stated that she occasionally feels as though she cannot get up to take her children places. (Id.). Plaintiff testified that the only place she takes her children is church. (Tr. 230). Plaintiff stated that she tries to attend church every Wednesday and Sunday with her children. (Id.).

Plaintiff's attorney noted that plaintiff was tearful during the hearing. (Id.). Plaintiff

---

[1]Depakote is indicated for the treatment of the manic episodes associated with bipolar disorder. See Physician's Desk Reference (PDR), 432 (57th Ed. 2003).

[2]An affective disorder characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and with major depressive episodes. Stedman's Medical Dictionary, 568 (28th Ed. 2006).

testified that she occasionally becomes tearful because she feels that she no longer takes care of her children properly.  (<u>Id.</u>).

Plaintiff stated that people help her clean her house.  (<u>Id.</u>).  Plaintiff testified that her fiancé helps her clean the house, helps her children with their homework, and helps her cook.  (Tr. 231). Plaintiff stated that her children are old enough to help with housework.  (<u>Id.</u>).  Plaintiff testified that her older daughters wash the younger children's clothes, clean the house, and occasionally cook.  (<u>Id.</u>).  Plaintiff stated that she does not do any housework.  (<u>Id.</u>).

Plaintiff testified that her father helps her shop for groceries once a month.  (<u>Id.</u>).  Plaintiff stated that if she needs items between the monthly shopping trips, her children or fiancé go to the store.  (<u>Id.</u>).

Plaintiff testified that she has not had many friends for the past two years.  (<u>Id.</u>).  Plaintiff stated that her children tell her she is moody.  (<u>Id.</u>).  Plaintiff testified that she has to watch what she says to her children.  (<u>Id.</u>).  Plaintiff stated that she stays in her bedroom a lot because she does not want to be around people.  (Tr. 232).  Plaintiff testified that she lets her children come in her room for brief periods.  (<u>Id.</u>).

Plaintiff stated that during the period after she was hospitalized but prior to seeing Ivy Alwell, she did not see a doctor regularly because she had a phobia of doctors.  (<u>Id.</u>).  Plaintiff testified that she had a bad experience with a doctor in the past.  (<u>Id.</u>).  Plaintiff explained that she developed gall stones, but her doctor did not believe her.  (<u>Id.</u>).  Plaintiff testified that she does not like to take medication and she does not want to be a "guinea pig."  (<u>Id.</u>).

Plaintiff stated that she gained a lot of weight as a result of her medication.  (Tr. 233). Plaintiff testified that she is five feet, four inches tall and weighs 230 pounds.  (<u>Id.</u>).  Plaintiff

stated that she does not eat a lot. (Id.).

Plaintiff testified that she used marijuana in the past. (Id.). Plaintiff stated that she used to smoke marijuana to calm her down. (Id.). Plaintiff testified that she self-medicated instead of taking prescription medication. (Tr. 234). Plaintiff stated that she had not smoked marijuana since she started seeing Ivy and taking prescription medication. (Id.). Plaintiff testified that she stopped smoking marijuana in January or February of 2006. (Id.).

Plaintiff stated that it takes her a long time to get ready. (Id.). Plaintiff testified that she finds herself walking in circles or doing the same thing twice. (Tr. 235). Plaintiff stated that she also has difficulty getting along with people in the work environment. (Id.).

Plaintiff testified that she receives treatment for sleep apnea.[3] (Id.). Plaintiff stated that she has a breathing machine, although she does not use it because it makes her feel as if she is suffocating. (Id.).

The ALJ then examined plaintiff, who testified that her usual weight is 175 to 185 pounds. (Id.). Plaintiff stated that she last weighed in this range when she was working. (Id.). Plaintiff testified that she used to exercise a lot but she is unable to exercise now. (Id.).

Plaintiff stated that she is divorced. (Tr. 236). Plaintiff testified that she was divorced in December 2002. (Id.). Plaintiff stated that she separated from her husband one month after they married in November 2000. (Id.). Plaintiff testified that she does not receive any child support. (Id.). Plaintiff stated that the father of five of her children is incarcerated. (Id.). Plaintiff testified that she has notified authorities that the father of her sixth child is not paying child support. (Id.).

---

[3]Obstructive sleep apnea is a disorder characterized by recurrent interruptions of breathing during sleep due to temporary obstruction of the airway by lax, excessively bulky, or malformed pharyngeal tissues with resultant hypoxia and chronic lethargy. See Stedman's at 119.

Plaintiff stated that one of her sons has a learning disability and she receives SSI benefits in the amount of $600.00 a month for him. (Tr. 237). Plaintiff testified that this is her only source of income. (Id.). Plaintiff stated that she also receives food stamps in the amount of $600.00 a month. (Id.). Plaintiff testified that she receives assistance with her utility bills if she requests it. (Id.). Plaintiff stated that she receives Section 8 housing assistance. (Id.).

Plaintiff testified that she began experiencing difficulty working right before she left her job at the Department of Public Safety in Oklahoma in 2003. (Id.). Plaintiff stated that she left this position due to the difficulties she was having. (Id.). Plaintiff testified that her employer started sending her to a psychologist. (Id.). Plaintiff stated that, although her alleged onset date is June 15, 2003, she started seeing a psychologist two to three months prior to that time. (Tr. 238). Plaintiff testified that she came to St. Louis because she was having a hard time and her mother suggested that she come home. (Id.).

Plaintiff stated that she graduated from Parkway Central High School in St. Louis. (Id.). Plaintiff testified that she attended college for one year. (Tr. 239). Plaintiff stated that she received computer training at St. Louis Job Cops and Normal Technology Center in Oklahoma. (Id.).

Plaintiff testified that she worked as a supervisory assistant at Converges, which is a call center. (Id.). Plaintiff stated that at this position, she prepared summaries of the employees' progress for her supervisor. (Id.). Plaintiff testified that she supervised employees at this position. (Id.).

Plaintiff stated that she also worked as an administrative technician for the Department of Public Safety in Oklahoma. (Tr. 240). Plaintiff testified that at this position, she entered data in

the computer.  (Id.).

Plaintiff stated that she was born in St. Louis.  (Id.).  Plaintiff testified that she took the Metrolink to get to the hearing.  (Id.).  Plaintiff stated that her fiancé drove her from her home to the Metrolink station.  (Id.).  Plaintiff testified that she planned to walk from the hearing to the Metrolink station, ride the Metrolink, transfer to a bus, and then walk four blocks home.  (Id.).

Plaintiff stated that she sees her fiancé every day.  (Tr. 241).  Plaintiff testified that her fiancé comes into her bedroom to see her.  (Id.).  Plaintiff stated that her fiancé is the father of her youngest son.  (Id.).  Plaintiff testified that she is bringing an action against her fiancé for child support.  (Id.).

Plaintiff stated that her fiancé occasionally takes her to get ice cream.  (Id.).  Plaintiff testified that the church van takes her to church.  (Id.).  Plaintiff stated that her fiancé attends church with her.  (Tr. 242).  Plaintiff testified that she enjoys swimming, dancing, photography, reading, and seeing plays.  (Id.).  Plaintiff stated that she last saw a movie two years prior to the hearing.  (Id.).  Plaintiff testified that she last saw a play four years prior to the hearing.  (Id.).

Plaintiff stated that she knows how to read and write.  (Id.).  Plaintiff testified that her children and fiancé do the housework.  (Tr. 243).  Plaintiff stated that her fiancé does not live with her, although he occasionally stays the night.  (Id.).  Plaintiff testified that her fiancé usually comes over in the morning before he goes to work and come back after he gets off work.  (Id.).

Plaintiff stated that she wrote a letter to authorities to report her fiancé.  (Id.).  Plaintiff testified that a friend from church told her how to write the letter.  (Id.).

Plaintiff stated that her fiancé washes her clothes and her boys' clothes and her daughters wash their own clothes.  (Id.).  Plaintiff testified that her children cook.  (Tr. 244).  Plaintiff stated

that she occasionally cooks. (Id.).

Plaintiff testified that she smokes a package of cigarettes every two to two-and-a-half days. (Id.). Plaintiff stated that she does not drink alcoholic beverages. (Id.). Plaintiff testified that she attended group meetings to help her quit smoking marijuana. (Id.).

Plaintiff stated that her fiancé changes the sheets on her bed. (Id.). Plaintiff testified that her sons take out the trash. (Id.).

Plaintiff stated that her youngest son, Cameron Jones, is seven. (Tr. 245). Plaintiff testified that her son Rodney Jones III is nine. (Id.). Plaintiff stated that her fiancé is only the father of Cameron Jones. (Id.). Plaintiff testified that Dajah is eleven, Keeley is thirteen, Shonice is fourteen, and Brittany is sixteen. (Id.). Plaintiff stated that all of her children are in school. (Tr. 246). Plaintiff testified that her children wake up on their own and go to and from school on their own. (Id.).

Plaintiff stated that her son Rodney receives SSI benefits. (Id.). Plaintiff testified that Rodney has a learning disability. (Id.). Plaintiff stated that Rodney just started talking and he cannot write. (Id.). Plaintiff testified that she and her fiancé try to help Rodney with his homework. (Id.).

Plaintiff stated that her periods of high energy she experiences due to bipolar disorder last up to a week. (Tr. 247). Plaintiff testified that she experiences periods of low energy more frequently than the periods of high energy. (Id.). Plaintiff stated that she last took medication for her bipolar disorder the end of June or beginning of July of 2006. (Id.).

Plaintiff testified that she last saw the nurse practitioner Ivy the day prior to the hearing. (Tr. 248). Plaintiff stated that she has never seen the doctor for whom Ivy works. (Id.). Plaintiff

testified that she had seen Ivy a few times that year.  (Id.).  Plaintiff stated that Ivy regulates her medication.  (Id.).  Plaintiff testified that she refills her prescriptions at the beginning of the month when she receives her public assistance.  (Id.).  Plaintiff stated that she did not see Ivy from March 2006 to September 2006.  (Tr. 250).  Plaintiff testified that she attempted to see Ivy during this period to get her medications refilled but she did not have transportation.  (Id.).  Plaintiff stated that the transportation that her insurance provides is unreliable.  (Id.).  Plaintiff testified that she does not have a car.  (Tr. 251).  Plaintiff stated that her fiance's friend drove her to the hearing.  (Id.).

Plaintiff testified that she saw a doctor at the request of the SSA in October of 2004.  (Id.).  Plaintiff stated that she was feeling good that day, although she had not slept well the previous night.  (Id.).  Plaintiff testified that she was not being treated by a doctor or taking any medications when she saw this doctor.  (Id.).

Plaintiff stated that she does not hear voices or see things that are not there.  (Tr. 252).  Plaintiff testified that she has a television and a telephone in her bedroom.  (Id.).  Plaintiff stated that she has a radio in her bedroom, although she does not listen to it.  (Id.).  Plaintiff testified that she has a computer in her basement that is not hooked up to the telephone.  (Id.).  Plaintiff stated that her children use the computer at the library.  (Id.).

Plaintiff testified that her mother's house is a fifteen to twenty minute drive from plaintiff's house.  (Tr. 253).  Plaintiff stated that she has brothers and sisters that she sees when they come to plaintiff's house with her mother.  (Id.).  Plaintiff testified that she does not leave her house to see her family on holidays or birthdays.  (Id.).

Plaintiff stated that she has not bought clothes for herself in a long time.  (Id.).  Plaintiff

testified that her mother buys clothes for plaintiff's children. (Tr. 254).

Plaintiff stated that she has not been placed on a particular diet. (Id.). Plaintiff testified that she always watches what she eats. (Id.).

Plaintiff stated that her medication makes her feel a little better when she takes it. (Id.). When asked by the ALJ if she would be able to work when she takes her medication, plaintiff responded that it depends on how her new medication works. (Id.). Plaintiff testified that she did not work when she was taking her old medication because the medication made her drowsy. (Id.). Plaintiff stated that she did not think the drowsiness side effect was a problem at the time because she was not working and the medication was otherwise effective. (Tr. 255). Plaintiff testified that she took frequent naps and slept better when she was taking her old medication. (Id.).

The ALJ next examined the vocational expert, Vincent Stock, who testified that plaintiff has some basic computer skills that are transferable from her previous jobs as an administrative technician, supervisor's assistant, and data entry technician. (Tr. 256). Mr. Stock stated that plaintiff's skills would transfer to other types of semiskilled jobs. (Id.). Mr. Stock described plaintiff's previous work as semiskilled and sedentary or light. (Tr. 257).

The ALJ then asked Mr. Stock to assume that plaintiff has been diagnosed with a major depressive disorder and sleep apnea and is precluded from any type of work that would involve dangerous machinery or working at heights due to the sleep apnea. (Id.). The ALJ asked the ALJ to add the following limitations assuming plaintiff is taking her medication and not abusing marijuana: moderate limitation in ability to cope with normal work stresses; mild limitation in ability to function independently; moderate limitation in ability to behave in an emotionally stable

manner; moderate limitation in ability to maintain reliability; mild to moderate limitation in ability to relate in a social situation; moderate limitation in ability to accept instruction or respond to criticism; mild to moderate limitation in ability to maintain socially acceptable behavior; mild to moderate limitation in ability to understand and remember simple instructions; mild to moderate limitation in ability to make simple work related decisions; moderate limitation in ability to maintain regular attendance and be punctual; moderate limitation in ability to complete a normal workday and work week without interruptions from symptoms; moderate limitation in ability to maintain attention and concentration for extended periods of time; moderate limitation in ability to perform at a consistent pace without unreasonable number and length of rest periods; mild to moderate limitation in ability to sustain ordinary routine without special supervision; moderate limitation in ability to respond to changes in the work setting; mild to moderate limitation in ability to work in coordination with others; no episodes of decompensation of extended duration; and no episodes of loss of ability to understand, remember, and carry out instructions. (Tr. 258-59). Plaintiff testified that she occasionally throws up her food purposely. (Tr. 259). Plaintiff stated that she has been working on this issue since she started seeing Ivy. (Id.).

Mr. Stock testified that with the limitations described by the ALJ, plaintiff would be able to perform her past work as an administrative technician, supervisor's assistant, and data entry technician. (Tr. 260).

Plaintiff's attorney then questioned Mr. Stock, who testified that he was defining "moderate" as more than mild but not marked or severe. (Tr. 260). Mr. Stock stated that a moderate limitation in maintaining attention and concentration would cause a person to pay attention most of the time at work but have some impairment that would keep him or her from

focusing or attending at some times. (Tr. 261). Mr. Stock testified that multiple moderate limitations are complicating factors but supervisors have interactions with these employees and help them function. (Tr. 262).

Plaintiff's attorney then asked Mr. Stock if an individual would be able to work if she had the limitations described by Ivy Alwell. (Tr. 264). Mr. Stock testified that the individual would have difficulty performing any work with those limitations. (Id.). Mr. Stock noted that a GAF score of 42 is indicative of very significant work-related limitations. (Id.).

Plaintiff's attorney then requested that plaintiff's alleged onset of disability date be amended to October of 2005 because this is the date identified by Ivy Alwell. (Id.). Plaintiff's attorney stated that the medical evidence reveals that plaintiff's condition worsened since 2004. (Tr. 265).

The ALJ asked plaintiff's attorney how to handle under the regulations the fact that plaintiff's only diagnosis in the record is from a nurse practitioner and not a medical doctor. (Id.). The ALJ stated that Ivy Alwell is not considered an acceptable medical source under the regulations. (Tr. 266). Plaintiff's attorney argued that although a nurse practitioner was not a preferred source, it was an acceptable medical source under the regulations. (Id.). The ALJ noted that the physician should have been overseeing Ms. Alwell but he did not sign off on any of her records. (Id.). Plaintiff's attorney stated that the physician did not appear to have any input into Ms. Alwell's treatment of plaintiff. (Id.). The ALJ stated that he questioned whether there was a valid diagnosis due to this fact. (Tr. 267). The ALJ stated that Ms. Alwell does not prescribe medication and has to have a physician sign off on prescriptions. (Id.). The ALJ also noted that Ms. Alwell stated that plaintiff's bulimia ended at age seventeen yet she included

bulimia in her diagnosis. (Tr. 268).

Plaintiff's attorney indicated that he would submit a memorandum on these issues. (Id.). The ALJ asked plaintiff's attorney to also address the fact that plaintiff was not taking her medications when she was assessed by Ms. Alwell. (Tr. 269). Finally, the ALJ instructed plaintiff to inform him if she moved prior to the time he issued his decision. (Id.).

B.    **Relevant Medical Records**

The record reveals that plaintiff voluntarily admitted to Griffin Memorial Hospital on June 8, 2000, with complaints of depression and recurrent suicidal ideation. (Tr. 127). Plaintiff reported a plan to kill herself by driving her car into another car. (Id.). Plaintiff had been seeing Dr. Cynthia Taylor, a family physician, who had been treating plaintiff with medication for hypertension and depression. (Id.). Plaintiff indicated that she had sent her six children back to live with her mother while she sorts her life out. (Id.). Plaintiff reported a past history of cannabis and alcohol use which was infrequent in nature. (Id.). Plaintiff's medical history included hypertension and cholecystectomy.[4] (Id.). Donald Quiver, M.D. described plaintiff's appearance as unkempt and disheveled. (Id.). Plaintiff's memory was good, concentration was impaired, cognition was average, intellect was average, affect was flat, and mood was depressed. (Id.). Plaintiff was discharged on June 14, 2000, at which time Dr. Quiver diagnosed her with moderate major depression[5] and

_____

[4]Surgical removal of the gallbladder. Stedman's at 365.

[5]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbance, and feelings of worthlessness, guilt, and hopelessness. See Stedman's at 515.

assessed a GAF[6] of 60.[7]  (Tr. 128).

Plaintiff underwent a sleep study at the Sleep Disorder Center of Oklahoma on May 14, 2002.

(Tr. 166-67).  Jonathan R. L. Schwartz, M.D. diagnosed plaintiff with severe obstructive sleep apnea

with a significant associated oxygen desaturation and arousal.  (Tr. 167).  Dr. Schwartz noted that

use of a CPAP breathing machine resulted in significant reduction in apnea index and the abolition

of snoring.  (Id.).

Plaintiff saw John S. Rabun, M.D. on October 16, 2004, for a neuropsychiatric evaluation at

the request of the state agency.  (Tr. 169-72).  Plaintiff reported a history of high blood pressure.

(Tr. 169).  Plaintiff indicated that she had last seen a psychiatrist in June of 2000, when she was

hospitalized in Oklahoma.  (Id.).  Plaintiff stated that she was depressed at that time but she had not

had any psychiatric treatment prior to that hospitalization and had not received any treatment since

that hospitalization.  (Id.).  Plaintiff reported experiencing "a couple of days" in which she has no

energy and experiences difficulty getting out of bed because she did not sleep the night before.  (Id.).

Plaintiff did not describe a lasting change in mood, coupled with other symptoms found in major

depression.  (Id.).  Dr. Rabun described plaintiff as neatly dressed, appropriately groomed, pleasant

and cooperative.  (Id.).  Dr. Rabun diagnosed plaintiff with major depressive disorder, single

---

[6]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[7]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV at 32.

episode, in full remission. (Tr. 171). He assessed a GAF of 80.[8] (Id.). Dr. Rabun stated that plaintiff did not display deficits in her capacity to focus, concentrate, remember instructions, interact appropriately in a social setting, or adapt to changes in her environment. (Id.). Dr. Rabun expressed the opinion that plaintiff was capable of managing her own benefits or funds. (Id.).

Judith A. McGee, Ph.D. completed a Psychiatric Review Technique on November 2, 2004. (Tr. 173-85). Dr. McGee expressed the opinion that plaintiff suffered from major depression that was non-severe and resulted in no functional limitations. (Id.).

On November 28, 2005, plaintiff saw Ivy Alwell, MSN, APRN, BC. (Tr. 150-55). After taking a lengthy history, Ms. Alwell diagnosed plaintiff with bipolar disorder, depression, bulimia nervosa,[9] and marijuana abuse. (Tr. 155). Ms. Alwell prescribed Depakote, Seroquel,[10] and Lexapro.[11] (Id.).

On December 19, 2005, plaintiff reported feeling more calm, although Ms. Alwell noted that plaintiff was anxious. (Tr. 155). Plaintiff indicated that she had not been taking the Depakote or Seroquel as prescribed because she had been experiencing difficulty sleeping. (Id.).

---

[8]A GAF score of 71-80 denotes "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." DSM-IV at 32.

[9]A chronic morbid disorder involving repeated and secretive episodic bouts of eating characterized by uncontrolled rapid ingestion of large quantities of food over a short period of time (binge eating), followed by self-induced vomiting, use of laxatives or diuretics, fasting, or vigorous exercise to prevent weight gain; often accompanied by feelings of guilt, depression, or self-disgust. Stedman's at 276.

[10]Seroquel is indicated for the treatment of schizophrenia. See PDR at 682.

[11]Lexapro is indicated for the treatment of major depressive disorder. See PDR at 3532.

On December 20, 2005, plaintiff saw Kelly D. Gage, M.D. for a new patient visit. (Tr. 149). Dr. Gage noted that plaintiff had not recently taken her blood pressure medication, although her blood pressure was 120/78. (Id.). Plaintiff complained of numb hands and feet for a year, off and on, lower back pain, chest pain, and epigastric pain. (Id.). No mental health complaints were noted. (Id.). Dr. Gage's impression was possible hypertension and bipolar disorder with multiple symptoms, possibly psychosomatic. (Id.).

On December 29, 2005, plaintiff reported to Ms. Alwell that she was not sleeping well, cried all the time, and was agitated. (Tr. 157).

On January 5, 2006, plaintiff did not keep her appointment with Ms. Alwell. (Tr. 156).

On January 17, 2006, plaintiff reported that she was doing a little better, although she still had difficulty sleeping. (Id.).

On January 31, 2006, Ms. Alwell noted that plaintiff was nicely dressed and groomed. (Tr. 158). Plaintiff reported that she was anxious and had been off her medications because she could not afford them. (Id.).

Plaintiff failed to keep scheduled appointments with Ms. Alwell in March and April of 2006. (Tr. 159).

On May 13, 2006, Ms. Alwell received a refill request from Walgreens but denied the request because plaintiff had not been seen since January. (Id.). Ms. Alwell also denied refill requests on July 14, 2006, and July 27, 2006. (Id.).

On August 18, 2006, Ms. Alwell completed a Mental Medical Source Statement, in which she expressed the opinion that plaintiff had marked limitations in every category. (Tr. 162-65). Specifically, Ms. Alwell found that plaintiff had marked limitations in the ability to: cope with normal

work stress, function independently, behave in an emotionally stable manner, maintain reliability, relate in social situations, interact with general public, accept instructions and respond to criticism, maintain socially acceptable behavior, understand and remember simple instructions, make simple work-related decisions, maintain regular attendance and be punctual, complete a normal workday and workweek without interruptions from symptoms, maintain attention and concentration for extended periods, perform at a consistent pace, sustain an ordinary routine, respond to changes in work setting, and work in coordination with others. (Tr. 162-64). Ms. Alwell expressed the opinion that plaintiff had a substantial loss of the ability to understand, remember, and carry out simple instructions; make judgments that are commensurate with the functions of unskilled work; respond appropriately to supervision, co-workers and usual work situations; and deal with changes in a routine work setting. (Tr. 164). Ms. Alwell indicated that plaintiff's limitations lasted 13 continuous months or can be expected to last 13 continuous months at the assessed severity. (Id.). Ms. Alwell stated that plaintiff's disability began approximately one month prior to being seen on November 28, 2005. (Id.). Ms. Alwell diagnosed plaintiff with bipolar disorder, depressed; marijuana abuse; and bulimia. (Tr. 165). She assessed a most recent GAF of 42. (Id.). Ms. Alwell noted that she had last seen plaintiff January 31, 2006. (Id.).

Plaintiff saw Ms. Alwell on September 12, 2006, at which time plaintiff reported that she did not like to be around a lot of people. (Tr. 197). Plaintiff indicated that she presented for medication refills and that she had missed appointments due to transportation problems. (Tr. 198). Ms. Alwell noted that plaintiff was tearful, her affect was flat, and her mood was labile. (Id.). Ms. Alwell rated plaintiff's insight as fair and her judgment as impaired. (Tr. 199). Ms. Alwell diagnosed plaintiff with bipolar disorder, depressed. (Id.).

On September 26, 2006, plaintiff reported to Ms. Alwell that she gritted her teeth, was short-tempered and experienced difficulty sleeping. (Id.). Ms. Alwell added Klonopin[12] to plaintiff's prescriptions. (Tr. 200).

On October 9, 2006, plaintiff presented to Ms. Alwell accompanied by her significant other. (Id.). Plaintiff complained of an anxious and irritable mood. (Id.). Ms. Alwell stated that she spoke with plaintiff's significant other regarding plaintiff's ability to care for herself and her children. (Id.). Plaintiff's significant other indicated that he visited every day to help with the children. (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through June 30, 2008.

2.      The claimant has not engaged in substantial gainful activity since October 28, 2005, the amended alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.      The claimant has the following severe impairments: depression, hypertension, and sleep apnea (20 CFR 404.1520(c)) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform heavy work. The claimant does not have any medically diagnosed physiologic impairment that could reasonably be expected to result in any exertional limitation in the claimant's physical ability to perform basic work-related activities. However,

---

[12]Klonopin is indicated for the treatment of seizure disorders and panic disorder. See PDR at 2906.

because of the symptoms of the claimant's sleep apnea, the claimant must avoid any type of work that involves dangerous machinery or working at heights. Because of the symptoms of the claimant's depression, with medication, the claimant's ability to cope with normal work stresses would be moderate; her ability to function independently would be mild; behave in an emotionally stable manner would be moderate; maintain reliability would be moderate; to relate in a social situation would be mild to moderate; to accept instructions and respond to criticism would be moderate; to maintain socially acceptable behavior would be moderate; understand and remember simple instructions would be mild to moderate; make simple work-related decisions would be mild to moderate; maintain regular attendance and be punctual would be moderate; complete a normal workday and workweek without interruptions from symptoms would be moderate, maintain attention and concentration for extended periods of time would be moderate; perform at a consistent pace without an unreasonable number and length of rest periods would be moderate; sustain an ordinary routine without special supervision would be mild to moderate; respond to changes in the work setting would be moderate; work in coordination with others would be mild to moderate; episodes of decompensation of extended duration is none; and episodes of the loss of ability to understand, remember, and carry out simple instructions is none. In reaching this residual functional capacity, the undersigned Administrative Law Judge assumes that the claimant is compliant with her medications and that she no longer abuses marijuana.

6.     The claimant is capable of performing her past relevant work as an administrative technician and as a data entry technician. This work does not         require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.     The claimant has not been under a disability, as defined in the Social Security Act, from October 28, 2005, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 14-25).

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits filed on September 7, 2004, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.
>
> Based on the application for supplemental security income filed on September 7, 2004, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 25).

## Discussion

**A.      Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to

the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA

will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v.

Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but

enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley

v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the

Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956

F.2d 836, 838 (8th Cir. 1992).   The reviewing court, however, must consider both evidence that

supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater,

87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).

"[T]he court must also take into consideration the weight of the evidence in the record and apply

a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir.

1998).  The analysis required has been described as a "searching inquiry."  Id.

**B.      The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the

claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If

the claimant is able to perform the previous work, in consideration of the claimant's residual

functional capacity (RFC) and the physical and mental demands of the past work, the claimant is

not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step

involves a determination of whether the claimant is able to perform other work in the national

economy taking into consideration the claimant's residual functional capacity, age, education and

work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to

disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this

process, the burden remains upon the claimant until s/he adequately demonstrates an inability to

perform previous work, at which time the burden shifts to the Commissioner to demonstrate the

claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir.

1998).

The Commissioner has supplemented this five-step process for the evaluation of

claimants with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special

procedure must be followed at each level of administrative review.  See id.  Previously, a

standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented

application of this special procedure, had to be completed at each level and a copy had to be

attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a

(d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000).  Application of the

special procedures required is now documented in the decision of the ALJ or Appeals Council.

See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a,

416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent."  20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work:  activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c)), 416.920a (c)).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

## C.  Plaintiff's Claims

Plaintiff argues that the ALJ improperly weighed the opinion evidence of Nurse

Practitioner Ivy Alwell.  Plaintiff also contends that the ALJ failed to develop the record.  The undersigned will address plaintiff's claims in turn.

**1.     Opinion of Ivy Alwell**

Plaintiff argues that the ALJ improperly weighed the opinion evidence of Nurse Practitioner Ivy Alwell.  Specifically, plaintiff contends that the ALJ should have assigned greater weight to Ms. Alwell's opinion.

On August 9, 2006, the SSA issued Social Security Ruling (SSR) 06-3p, which clarified how it considers opinions from sources who are not what the agency terms "acceptable medical sources."  Under SSA regulations, "acceptable medical sources" include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists.  See 20 C.F.R. §§ 404.1513(a) and 416.913(a).  Only "acceptable medical sources" can provide evidence to establish the existence of a medically determinable impairment, provide medical opinions, and be considered treating sources, whose opinions may be entitled to controlling weight.  See 20 C.F.R. §§ 404.1513(a), 404.1527(a)(2), 416.927(a)(2), 404.1502, 416.902, 404.1527(d), and 416.927(d).

Information from "other sources," as defined in 20 C.F.R. § 404.1513(d) and 416.913(d) may be used to demonstrate the severity of the individual's impairment(s) and how it affects an individual's ability to function.  These sources include, but are not limited to licensed clinical social workers, chiropractors and therapists.  Id.  Information from these "other sources" cannot establish the existence of a medically determinable impairment.  Instead, there must be evidence from an "acceptable medical source" for this purpose.  Information from such "other sources," however, may be based on special knowledge of the individual and may provide insight into the

severity of the impairment(s) and how it affects the individual's ability to function. Id. Factors to consider in evaluating opinions from "other sources" include: how long the source has known and how frequently the source has seen the individual; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well the source explains the opinion; whether the source has a specialty or area of expertise related to the individual's impairment(s); and any other facts that tend to support or refute the opinion. Id.

Plaintiff acknowledges that Ms. Alwell is not an acceptable medical source. Plaintiff argues that the ALJ should have assigned greater weight to Ms. Alwell's opinion because she was the only medical source familiar with plaintiff's condition.

In his opinion, the ALJ discussed the Mental Medical Source Statement of Ms. Alwell at length. (Tr. 23). The ALJ first properly rejected Ms. Alwell's diagnosis of bipolar disorder but noted that plaintiff's diagnosis of depression was established by acceptable medical sources. (Id.). The ALJ pointed out that Ms. Alwell checked every "marked" box on a check-off form that was presented to her, indicating that plaintiff had marked limitations in every area of functioning. (Tr. 162-65). Ms. Alwell, however, did not provide any narrative explanation for her findings. The ALJ stated that Ms. Alwell's own treatment records do not support these "across-the-board drastic limitations." (Tr. 23). The ALJ pointed out that there is no objective medical evidence that could plausibly explain the level of deterioration in adaptive functioning from the time Dr. Rabun examined plaintiff on October 16, 2004, until Ms. Alwell examined her on November 28, 2005. Dr. Rabun diagnosed plaintiff with major depressive disorder, single episode, in full remission, with a GAF of 80. (Tr. 171). He found that plaintiff did not display

deficits in her capacity to focus, concentrate, remember instructions, interact appropriately in a social setting, or adapt to changes in her environment. (Id.). The ALJ stated that Ms. Alwell provided conservative treatment and did not refer plaintiff to a psychiatrist or psychologist. Finally, the ALJ noted that plaintiff did not see Ms. Alwell for a nine-month period. (Tr. 24).

The undersigned finds that the ALJ properly weighed the opinion of Ms. Alwell. The ALJ applied the relevant regulations and determined the Ms. Alwell's opinion as an "other source" was entitled to little weight. Although Ms. Alwell had the longest treatment relationship with plaintiff, all other factors discussed by the ALJ point in favor of assigning little weight to her opinion. Specifically, Ms. Alwell provided no narrative explanation for her restrictive findings, her own treatment notes do not support her opinion, and the other medical evidence of record does not support her opinion. Thus, the ALJ properly evaluated the opinion evidence of Ms. Alwell.

## 2.    Development of the Record

Plaintiff next argues that the ALJ did not adequately develop the record. Plaintiff notes that only Ms. Alwell examined plaintiff after her amended alleged onset date.

It is true that the ALJ has a duty to fully develop the record, particularly where a claimant is not represented by counsel. See Driggins v. Harris, 657 F.2d 187, 188 (8th Cir. 1981). This inquiry, however, is limited to whether the claimant was prejudiced or unfairly treated by the ALJ's development of the record. See Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993). "[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." Anderson v.

Shalala, 51 F.3d 777, 779 (8th Cir. 1999) (quoting Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994)).

The undersigned finds that there was sufficient evidence in the record before the ALJ. As previously discussed, the record contains the report of Dr. Rabun from a neuropsychiatric evaluation performed on October 16, 2004. (Tr. 169-72). At that time, Dr. Rabun found no limitations in plaintiff's ability to focus, concentrate, remember instructions, interact appropriately in a social setting, or adapt to changes in her environment. (Id.). Plaintiff sought no medical treatment from the date of Dr. Rabun's examination to November 28, 2005, when she saw Ms. Alwell for the first time. (Tr. 150). Plaintiff also missed several scheduled appointments with Ms. Alwell, resulting in a nine-month period of no treatment. Although the ALJ assigned little weight to Ms. Alwell's conclusions regarding plaintiff's mental limitations, the ALJ considered Ms. Alwell's treatment notes, along with plaintiff's own testimony regarding her limitations in formulating plaintiff's mental residual functional capacity. Plaintiff, who was represented by counsel, did not request that the record be held open to obtain additional evidence. Plaintiff has not provided any evidence that she was prejudiced by the ALJ's failure to obtain an additional consultative examination.

In summary, the ALJ properly evaluated the medical evidence contained in the record. The evidence is not, however, supportive of plaintiff's allegations of disability due to this impairment. Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying plaintiff's applications for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act be **affirmed**.


The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).


Dated this ___2nd___ day of February, 2009.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE